265 F.3d 83 (2nd Cir. 2001)
 KE ZHEN ZHAO, PETITIONER,
v.
UNITED STATES DEPARTMENT OF JUSTICE, JANET RENO, ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, BOARD OF IMMIGRATION APPEALS, OFFICE OF THE IMMIGRATION JUDGES; UNITED STATES DEPARTMENT OF JUSTICE, DORIS MEISNER, COMMISSIONER OF IMMIGRATION AND NATURALIZATION SERVICE; AND EDWARD J. MCELROY, DISTRICT DIRECTOR, RESPONDENTS.
 Docket No. 00-4022
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: October 25, 2000
Decided September 5, 2001
 
 Petitioner Ke Zhen Zhao appeals from a December 28, 1999 decision of the Board of Immigration Appeals, which denied his motion to reconsider an adverse ruling on his application for asylum and withholding of deportation.
 Reversed and remanded.[Copyrighted Material Omitted]
 Bruno J. Bembi, Hempstead, New York, for Petitioner-Appellant.
 Diogenes P. Kekatos, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney, Jeffrey Oestericher, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Respondents-Appellees.
 Before: Cardamone, Pooler, and Katzmann, Circuit Judges.
 
 Cardamone, Circuit Judge
 
 1
 Petitioner Ke Zhen Zhao is a national of the People's Republic of China (PRC) who seeks asylum in the United States on account of China's "one family-one child" policy. He appeals from the denial of his motion to reconsider his application after the Board of Immigration Appeals (Board) affirmed an adverse ruling by an immigration judge that rejected his asylum petition. Respondents are the United States Attorney General, the Board, the Office of Immigration Judges, the Commissioner of the Immigration and Naturalization Service (INS) and the District Director of the INS.
 
 
 2
 When the immigration judge made the adverse ruling on petitioner's asylum application, and the Board denied his motion to reconsider its affirmance of that ruling, these administrative judges were exercising their discretionary authority. Courts ordinarily defer to such discretionary administrative determinations, lest a court substitute a judicial view for an agency's experience and expertise. But granting deference to administrative tribunals does not mean we have clothed their rulings with that kind of power expressed in the maxim the "king can do no wrong." To the contrary, administrative tribunals are not royal judges, and their rulings are not unfettered; instead they are constrained to decide cases in a non-arbitrary manner. Thus, when a court is persuaded in a given case, such as this one, that an administrator has acted arbitrarily or capriciously, the ordinary entitlement to judicial deference disappears.
 
 BACKGROUND
 Entry Into the United States
 
 3
 When Zhao arrived in the United States on February 26, 1992 at Honolulu International Airport, he was questioned through an interpreter by an INS official. He acknowledged that he understood the questions asked him and admitted to using a false passport from Korea under a false name. Zhao said he obtained the passport in Bangkok, Thailand from a person unknown to him, and that while he paid $3400 to get to Hawaii, his brother agreed to pay another $20,000 upon his arrival in New York. Petitioner told the INS official he came to the United States to find work.
 
 
 4
 That same day the INS served written notice on Zhao that he would be subject to exclusion proceedings and possibly deportation. He was charged with: intending to immigrate for employment purposes without certification from the Secretary of Labor, 8 U.S.C. § 1182(a)(5)(A) (1994 & Supp. V 1999) (substantially unchanged from 1992 statute); seeking entry into the United States through fraud, id. § 1182(a)(6)(C)(i) (1994 & Supp. V 1999) (same); and lacking valid entry documents, id. § 1182(a)(7)(A)(i)(I) (1994 & Supp. V 1999) (same). After two years of adjournments, a hearing on those charges, at which petitioner had counsel, was held on February 28, 1994.
 
 Asylum Application
 
 5
 Prior to that hearing, Zhao had filed an application in September 1992 seeking asylum in the United States and the withholding of his deportation. In a statement attached to the application, he indicated he left China in November 1991 "to escape the threats and persecution of the Chinese Communist government and to avoid imprisonment and sterilization as a consequence of my political views and supposedly anti-government activities regarding the government's Birth Control policy."
 
 
 6
 According to petitioner, after his second son was born the government imposed a fine that he could not afford to pay. Troops attempted to arrest him several times. When higher-level officials were called in to effect his arrest, Zhao -- fearing imprisonment and forcible sterilization -- went into hiding for three years.
 
 
 7
 He claimed in his application that were he to return to China, officials there would consider him guilty of two criminal acts --opposing and violating the birth control policy and leaving China without permission. As punishment, he anticipated being sentenced to prison or a labor camp and being forcibly sterilized.
 
 Exclusion Proceedings
 
 8
 The immigration judge who presided over petitioner's exclusion hearing did so with the help of an interpreter. After petitioner conceded the charges lodged against him by the INS, the immigration judge turned the focus of the hearing to Zhao's asylum and withholding of deportation application. In support of that application Zhao's counsel filed copies of his: (1) marriage certificate, (2) household registration booklet, (3) birth certificate, (4) resident I.D. for the People's Republic of China, and (5) family planning policy registration card indicating that his wife underwent tubal ligation. The government, for its part, submitted petitioner's false passport and his statement to the INS official on his date of entry into the United States.
 
 
 9
 Only petitioner testified at the hearing. He stated that he had worked in construction for a private company in the Fujian province of China. His wife became pregnant four times during their marriage. Her first pregnancy resulted in a miscarriage. She gave birth to a son in 1985. Her third pregnancy was aborted due to health problems, and her fourth resulted in the birth of a second son in 1989.
 
 
 10
 When asked whether he and his wife could have more children, Zhao answered that his wife had been sterilized on September 28, 1989. Referring to China's policy of allowing only one child per family, he stated that his wife was ordered by the Chinese government to undergo the sterilization procedure. The order was first in writing, but local officials came to their house later to tell her she had to go for the procedure.
 
 
 11
 Petitioner claimed he voiced his opposition to the sterilization and promised not to have any more children, but described the officials as insistent that his wife be sterilized. Zhao testified that he was fined 20,000 yuan in 1989 (about $2500-$3500 in U.S. dollars) just prior to his wife's sterilization procedure, but could not afford to pay that amount. He further testified that local officials tried to arrest him for his failure to pay the fine and because he had not immediately agreed to his wife having the procedure. Petitioner escaped arrest by leaving the Fujian province soon before his wife underwent sterilization.
 
 
 12
 On cross-examination, he acknowledged that his primary reason for coming to the United States was to find work. He said that before flying to Hawaii, he had worked for two years in Nancheng, located in China's Jiangxi province, and then moved to the Hunan province. But in Hunan, he said he was not allowed to work for reasons supposedly linked to his opposition to the birth control policy.
 
 
 13
 The government also asked whether petitioner's wife paid the fine levied against him. Petitioner answered she did not have to pay because she was sterilized. Upon being asked what he expected if he returned to China, Zhao answered that he thought he would be arrested for violating the birth control policy, even though his wife had been sterilized. When questioned why he believed Chinese officials were still after him, he explained that his wife and other contacts in China had so warned him. Moreover, he explained that emigrants who returned to China are routinely arrested, punished and fined.
 
 Decision of the Immigration Judge
 
 14
 Upon the conclusion of petitioner's testimony, the immigration judge admitted into evidence the U.S. State Department's general advisory comments regarding country conditions on asylum claims from Chinese immigrants. He then rendered an oral decision in which he first ruled that with petitioner having conceded the charges alleged by the INS, "excludability has been established by clear and convincing evidence." As such, Zhao could remain in this country only if his asylum and withholding of deportation application were granted.
 
 
 15
 After summarizing petitioner's hearing testimony, the immigration judge noted "[t]he credibility of the applicant is of extreme importan[ce] in assessing his claim." The judge found petitioner's testimony not to be credible insofar "as it refers specifically to his application for asylum which in no way addresses any concern about his wife's sterilization." He pointed out that the application made no mention of petitioner's wife undergoing sterilization, even though petitioner submitted documentation showing she had undergone an oviduct ligation. The judge further highlighted the fact that when Zhao arrived in the United States, he indicated his only purpose in immigrating was to find work. Again, the judge observed that petitioner did not appear to have experienced troubles with the Chinese government, as evidenced by the two years he spent working in Nancheng.
 
 
 16
 Referring to the report of the State Department, he also noted that in rural areas of China, where petitioner lived, having two children seemed to be the norm and enforcement of the "one family-one child" rule was less strict. The immigration judge concluded that the record did not show any incidents of past persecution, and petitioner had presented no evidence to establish a well-founded fear of future persecution upon his return to China. The immigration judge therefore denied petitioner's application for asylum and withholding of deportation.
 
 Appeal to the Board of Immigration Appeals
 
 17
 Petitioner filed a timely appeal from this ruling on March 3, 1994. Over four years later, on August 26, 1998, the Board issued its per curiam decision dismissing the appeal. The Board recognized the law had changed since petitioner's application had been denied. In particular, in 1997 the Board had ruled that an alien whose spouse was forcibly sterilized could establish past persecution on account of political opinion, be presumed to have a well-founded fear of future persecution, and thereby qualify as a "refugee" eligible for asylum within the statutory definition, which had been amended in 1996 to so provide. See In re C-Y-Z-, 21 I. & N. Dec. 915, 1997 WL 353222, 1997 BIA LEXIS 25 (BIA June 4, 1997). Although Zhao's hearing testimony had focused on his wife's sterilization, the Board summarily stated that it found substantial evidence to support the immigration judge's adverse credibility findings and concluded that no basis existed for overturning that judge's decision.
 
 Motion to Reconsider
 
 18
 Petitioner filed a motion asking the Board to remand his case to the immigration judge. The Board returned that motion because the case was no longer pending before it, but advised Zhao that he could file a motion to reopen or reconsider, if the time for doing so had not expired. Proceeding with different counsel, Zhao then filed a motion to reconsider on November 23, 1998. Relief was sought on two grounds: (1) ineffective assistance of counsel; and (2) the production of additional evidence of his wife's sterilization in the form of radioactive dye tests performed in May 1998.
 
 
 19
 In a decision issued December 28, 1999 the Board reasoned that because petitioner's present motion did not identify a legal or factual error in the ruling dismissing his appeal, the motion was not properly brought as one for reconsideration. It therefore characterized the motion as one to reopen his case. Turning to the merits of the ineffective assistance claim, the Board found Zhao had not satisfied the requirements for such a claim as set forth in In re Lozada, 19 I. & N. Dec. 637 (BIA Apr. 13, 1988). With respect to the radiographic dye tests, the Board held that "[petitioner's] wife was already sterilized when he presented his claims to the Immigration Judge, and the Immigration Judge so found." In any event, the Board continued, "he may not now buttress his claim with a subsequent test when that test could have been conducted earlier and presented at the former hearing." Thus, the motion to reopen was denied.
 
 
 20
 Petitioner has appealed the denial of his motion to reopen, challenging only the Board's decision regarding the submission of additional evidence.
 
 DISCUSSION
 I. Scope of Our Review
 
 21
 Before examining the merits of the appeal, we must define the extent to which the administrative proceedings may be reviewed in this Court. In 1996 Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009, 3009-546 (IIRIRA or Act). IIRIRA, in pertinent part, repealed § 106 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1105a, which had provided for judicial review of deportation and exclusion orders. See IIRIRA § 306(b), 110 Stat. at 3009-612.
 
 
 22
 Yet that repeal does not affect this case because under transitional provisions in IIRIRA, which are not codified in the United States Code, see id. § 309, 110 Stat. at 3009-625, the final provisions pertaining to removal procedures shall not apply to an alien like petitioner who was in exclusion or deportation proceedings at the time the amendments took effect. Id. § 309(c)(1), 110 Stat. at 3009-625. IIRIRA § 309(c)(4)(A) explains that judicial review of final exclusion or deportation orders entered in such cases after October 30, 1996 is governed by INA § 106(a) and (c), 8 U.S.C. § 1105a(a) and (c), as those subsections existed prior to the Act's amendments. Hence, although petitioner seeks review of his motion for reconsideration, such review in a transitional case is still governed by the former 8 U.S.C. § 1105a. See Iavorski v. U.S. INS, 232 F.3d 124, 128 n.2 (2d Cir. 2000) (reviewing motions to reopen); see also Henderson v. INS, 157 F.3d 106, 117 (2d Cir. 1998).
 
 
 23
 The pre-IIRIRA version of § 1105a instructed that "any review sought with respect to a motion to reopen or reconsider [a final exclusion or deportation] order shall be consolidated with the review of the order." 8 U.S.C. § 1105a(a)(6) (1994). Important for purposes of this case, this statutory provision was interpreted to mean that an appeal from a final order of exclusion or deportation and an appeal from a denial of a motion to reopen or reconsider that final order involved "two separate petitions filed to review two separate final orders." Stone v. INS, 514 U.S. 386, 405 (1995). Once petitioner's exclusion order was affirmed by the Board, it became final. See 8 U.S.C. § 1101(a)(47)(B) (Supp. V 1999). Under former § 1105a(a)(1), petitioner had 90 days to file a petition for review of the final order but he failed to do so, and his filing of a motion for reconsideration did not toll the time for filing a petition to review. Stone, 514 U.S. at 398, 405-06.
 
 
 24
 Thus, the appeal before us brings up for review only the Board's denial of the motion to reconsider. See Anderson v. McElroy, 953 F.2d 803, 806 (2d Cir. 1992) (explaining that since petitioner failed to bring direct appeal from deportation order, only the Board's denial of a stay of deportation sought with a motion to reopen could be reviewed). Because we are precluded from passing on the merits of the underlying exclusion proceedings, petitioner's assertions that he received no due process at his hearing and that the immigration judge's credibility determination was not based on substantial evidence are not before us.
 
 II Motion to Reopen v. Motion to Reconsider
 
 25
 Before examining the denial of the motion to reconsider, we pause to analyze petitioner's challenge to the Board's conversion of his motion for reconsideration to a motion to reopen. The Board has ruled that these motions are separate and distinct and are not interchangeable. See In re Cerna, 20 I. & N. Dec. 399, 402 (BIA Oct. 7, 1991) (quoting Chudshevid v. INS, 641 F.2d 780, 783 (9th Cir. 1981)).
 
 
 26
 Prior to IIRIRA, regulations promulgated by the Attorney General provided the only authority for filing a motion to reconsider or reopen a deportation proceeding. See INS v. Doherty, 502 U.S. 314, 322 (1992). Section 304(a)(3) of IIRIRA, 110 Stat. at 3009-589, 3009-593, added provisions to 8 U.S.C. § 1229a similar to those regulations then in effect. Subsequently, the regulations were amended to reflect the changes in the statute. See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997) (codified in part at 8 C.F.R. § 3.2).
 
 
 27
 Nonetheless, the new statutory provisions in 8 U.S.C. § 1229a are subject to the already noted transitional rules of IIRIRA and hence inapplicable to petitioner. Although the transitional rules make no mention of regulatory authority, we need not decide whether the post-IIRIRA regulations apply to petitioner's case, since the substantive content of the regulations preceding and post-dating IIRIRA is substantially the same for purposes of this appeal. The pre-IIRIRA version of the regulations is found in the Federal Register. See Executive Office for Immigration Review; Motions & Appeals in Immigration Proceedings ("Motions & Appeals"), 61 Fed. Reg. 18,900 (Apr. 29, 1996). The current version is found at 8 C.F.R. § 3.2 (2001).
 
 
 28
 Under either version of the regulations, a motion for reconsideration must specify the errors of fact or law in the Board's decision and be supported with pertinent authority. 8 C.F.R. § 3.2(b)(1); Motions & Appeals, 61 Fed. Reg. at 18,904. "A motion to reconsider asserts that at the time of the Board's previous decision an error was made." In re Cerna, 20 I. & N. Dec. at 402. When the Board reconsiders it takes itself back in time and looks at the case as though a decision had never been entered. Thus, if it grants the motion, the Board considers the case anew as it existed at the time of the original decision. Id. By contrast, a motion to reopen asks that the proceedings be reopened for new evidence and a new decision, usually after an evidentiary hearing. Id. at 403. Such motions must state what new facts would be proven at a hearing and be supported by affidavits or other evidentiary material. See 8 C.F.R. § 3.2(c)(1); Motions & Appeals, 61 Fed. Reg. at 18,905.
 
 
 29
 In the present case, petitioner's motion included new evidence and asked for relief because "proper documentation of a critical aspect of the applicant's claim [was not] made." It therefore was correctly classified as a motion to reopen. The Board also properly observed that the motion papers failed to identify a legal or factual error in its previous decision of August 26, 1998, as required for a motion to reconsider.
 
 
 30
 Petitioner reasons that because he attached copies of the radioactive dye tests to his motion, the Board should have deduced what he thought were the errors underlying the prior decision. But a motion for reconsideration asks the Board to reevaluate its decision on the existing factual record. See In re Cerna, 20 I. & N. Dec. at 402. Further, the Board itself has instructed that with respect to previously-barred asylum claims based on coercive family planning policies, an applicant should file a motion to reopen. See In re X-G-W-, Interim Dec. 3352, 1998 WL 378104, 1998 BIA LEXIS 18, at *8-9 (BIA June 25, 1998). Thus, the Board properly re-classified petitioner's motion as one to reopen his deportation case.
 
 
 31
 III. Legal Landscape Surrounding Petitioner's Application
 
 A. Definitions
 
 32
 At all relevant times since Zhao's arrival in the United States in 1992 asylum has been a discretionary form of relief for which only statutorily-defined "refugees" are eligible. See 8 U.S.C. § 1158(b)(1) (1994 & Supp. V 1999) (modifying language formerly at § 1158(a)). "Refugee" is defined to include any person who is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution" based on any of five enumerated grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42) (1994 & Supp. V 1999). Withholding of deportation is a mandatory form of relief to which an alien is entitled only "if the Attorney General decides that such alien's life or freedom would be threatened in [his native] country because of" any of those same five grounds. 8 U.S.C. § 1231(b)(3)(A) (Supp. V 1999) (modifying language formerly at § 1253(h)(1)). The standard of proof for withholding deportation involves a showing of a "clear probability" of a threat to life or freedom, which is more stringent than that required for a claim of asylum. See Melendez v. U.S. Dep't of Justice, 926 F.2d 211, 215 (2d Cir. 1991). While these concepts have remained steadfast over time, a full understanding of the decisions leading up to this appeal and petitioner's arguments before us requires a review of changes in the law.
 
 
 33
 In 1989 the Immigration Board held that China's "one family-one child" policy was not persecutory on its face. See In re Chang, 20 I. & N. Dec. 38, 43 (BIA May 12, 1989). Because of this ruling immigrants who simply claimed that they were subject to this policy could not be granted either asylum or have their deportation withheld. See id. at 44, 47. Instead, they had to produce evidence that persecution would be or was taken for a reason other than general population control. See id.
 
 B. Congress Acts
 
 34
 During the pendency of petitioner's appeal to the Board, Congress in 1996 enacted IIRIRA. That Act added the following language to the definition of "refugee"
 
 
 35
 For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.
 
 
 36
 8 U.S.C. § 1101(a)(42) (1994 & Supp. V 1999).
 
 
 37
 In making this change in the statute Congress had before it evidence that prompted it to act to change the law. This evidence was developed at congressional subcommittee hearings on the subject of coercive population control in China that were held in May, June, and July 1995. See Coercive Population Control in China: Hearings Before the Subcomm. on Int'l Operations & Human Rights of the House Comm. on Int'l Relations (Hearings), 104th Cong. (1995). The subcommittee chairman spread on the pages of the Congressional Record the findings derived from those hearings.
 
 
 38
 He noted that forced abortion and forced sterilization are among the "most gruesome human rights violations," but that refugees fleeing such treatment from the People's Republic of China by coming to the United States had their asylum claims rejected by the INS. 142 Cong. Rec. 6008 (1996) (statement of Rep. Smith, Chair, House Subcomm. on Int'l Operations & Human Rights). These women were forced back to China because they were regarded as common criminals and treated accordingly. The INS, by adopting in 1994 a policy of denying asylum to those fleeing forced sterilization, had reversed a long-standing policy of granting asylum to such refugees, if they could prove a well-founded fear that they were subject to a violation of their fundamental human rights. Hearings, 104th Cong. 29 (statement of Rep. Smith).
 
 
 39
 The People's Republic of China has repeatedly cracked down on those who resist forced sterilization. It treats them as political and ideological criminals, and as enemies of the state. On that rationale, the PRC has inflicted harsh punishment on refugees who are returned, such as beatings and being sent to forced labor camps, and being sentenced to prison. 142 Cong. Rec. 6008-09. It was on this record that Congress amended the definition of "refugee."[1]
 
 
 40
 Following IIRIRA, the Board acknowledged that the Act retroactively superseded the view expressed in In re Chang, and held that an alien forced to undergo sterilization pursuant to a population control program should be deemed to have suffered past persecution on account of political opinion and was thereby entitled to the regulatory presumption of a well-founded fear of future persecution. See In re X-P-T-, 21 I. & N. Dec. 634, 1996 WL 727127, 1996 BIA LEXIS 38, at *6 (BIA Dec. 18, 1996). The next year the Board ruled in In re C-Y-Z- that an alien can establish past persecution and become entitled to the presumption of a well-founded fear of future persecution if he can show that his spouse was forced to undergo sterilization. 1997 BIA LEXIS 25, at *9-10, 12. These amended administrative standards were in effect when the Board ruled on petitioner's appeal and his motion to reconsider in 1998 and 1999 respectively.
 
 IV Denial of Petitioner's Motion
 
 41
 Zhao's motion to reopen his case was denied on the ground that evidence of the radioactive dye tests could have been presented at the exclusion hearing. That decision by the Board may be reversed only upon our finding that it abused its discretion. INS v. Abudu, 485 U.S. 94, 104-05 (1988). An abuse of discretion may be found in those circumstances where the Board's decision provides no rational explanation, inexplicably departs from established policies, Douglas v. INS, 28 F.3d 241, 243 (2d Cir. 1994), is devoid of any reasoning, or contains only summary or conclusory statements, Anderson, 953 F.2d at 806; that is to say, where the Board has acted in an arbitrary or capricious manner.
 
 
 42
 In taking issue with the denial of his motion, Zhao contends the decision was arbitrary because with respect to the question of whether his wife was sterilized, the Board stated "the Immigration Judge so found." Yet, it further ruled his application could not be "buttress[ed]" with the results of radioactive dye tests that the Board concluded could have been conducted earlier and presented at the exclusion hearing. Once the Board recognized his wife's sterilization, petitioner insists, it was obliged to apply IIRIRA and the holding of In re C-Y-Z -.
 
 
 43
 Respondents, including the Board, believe petitioner is reading the Board's language out of context. First, they describe the immigration judge's decision as simply reciting what petitioner had asserted at the hearing, without actually determining whether Zhao's wife was in fact sterilized. Second, insofar as the Board stated that petitioner's wife "was already sterilized" at the time of the 1994 hearing, respondents consider the Board to have ruled only that the radioactive dye tests did not relate to new matter because petitioner had submitted evidence and testified to her sterilization at the hearing.
 
 
 44
 For all of the reasons that follow, no matter how one construes the Board's reference to what the immigration judge "found" at the exclusion hearing, it was an abuse of discretion to deny petitioner's motion to reopen.
 
 A. Accepting Petitioner's Interpretation
 
 45
 The plain meaning of the language used to deny Zhao's motion supports his argument that the Board was recognizing a finding of fact. If the Board were to have considered the fact of sterilization established, then, because it was explicitly crediting petitioner's testimony and evidence on this point for the first time, the Board should have explained why Zhao's case would not be reopened in light of In re C-Y-Z-. That case and this are very similar -- much more so than the Board acknowledges -- and in In re C-Y-Z-, both asylum and withholding of deportation were conditionally granted.
 
 
 46
 In re C-Y-Z- involved a claim for asylum based on China's family planning policy. 1997 BIA LEXIS 25, at *2. The applicant testified that after the birth of his third child, his wife was forced to undergo sterilization. Id. at *3. In support of that testimony, the applicant submitted unauthenticated copies of a certificate that his wife was sterilized, a document showing that he was fined, a marriage certificate, birth certificates for his children and a copy of his household registry. Id. Similarly, in the case at hand, petitioner testified that his wife was sterilized against her will in 1989 following the birth of their second son, and to support that claim submitted his marriage certificate, a registration card indicating his wife underwent tubal ligation and his household registration booklet.
 
 
 47
 The immigration judge in In re C-Y-Z- explicitly avoided making a credibility determination about whether the applicant was telling the truth, lying or embellishing the facts. Id. at *4. Rather, the judge observed that the applicant and his wife had the children they wanted despite "roadblocks" put up by the Chinese government, including a threat of arrest and a one-day detention, the imposition of a fine and an order for an abortion that caused the couple to go into hiding. Id. With respect to the testimony that the applicant's wife was forcibly sterilized, the Board noted that the immigration judge never explicitly recognized that claim as fact, but instead referenced petitioner's assertions in conjectural terms such as, "'if indeed she was forced to undergo an involuntary sterilization'" and "'alleged adverse factors... including forced sterilization.'" (emphases added). Id. at *4-5.
 
 
 48
 The immigration judge's decision with respect to Zhao is similar. The immigration judge believed petitioner had suffered little in China as a result of having two children. Petitioner also relies on the language used in the decision on the motion to reopen to argue that the Board thought the immigration judge found petitioner's wife was sterilized.
 
 
 49
 Such a finding would not be at odds with the judge's adverse credibility determination. A close look at the immigration judge's decision reveals Zhao was found not credible because the focus of his testimony differed from the focus of his application for asylum and withholding of deportation, and that in turn differed from the reason he gave for entering the United States when questioned in Hawaii. The immigration judge thought Zhao's testimony lacked "rationale and internal consistency," in addition to being "quite general in nature and not sufficiently detailed to provide a plausible, coherent account for his fear." With regard to whether petitioner had a well-founded fear of persecution upon return to China, the immigration judge observed that he found no "direct, credible, and specific evidence" either that petitioner possessed a belief that a persecutor would seek to overcome by punishment or that such official had the inclination to punish petitioner.
 
 
 50
 In other words, the immigration judge's decision can be read as not passing on the truthfulness of the testimony, but rather faulting petitioner for inconsistency and generality. See Zhang v. Reno, 27 F. Supp. 2d 476, 476-77 & n.1 (S.D.N.Y. 1998) (granting habeas petition where immigration judge's adverse credibility finding rested on failure to raise sterilization claim in initial statement to INS, without regard to truthfulness of petitioner's testimony, given that extant law did not recognize such a claim). To the extent the Board in our case may have considered the immigration judge to have found petitioner's wife was sterilized, petitioner's credibility cannot be disparaged as a whole. Since petitioner stated at the exclusion hearing that his wife underwent such a procedure, the registration card for the family planning policy showed the same, and the language used by the Board implies it is willing to accept such a finding on the part of the immigration judge, logic would dictate that petitioner was truthful at least in some aspect of his testimony. For this reason, respondents' declaration that nothing in the motion to reopen overcame the adverse credibility determination made by the immigration judge and accepted by the Board on direct appeal rings hollow.
 
 
 51
 Finally, the INS in In re C-Y-Z- urged that asylum be denied because the applicant submitted unauthenticated documents, the immigration judge questioned the applicant's need to leave China and observed that the harm inflicted did not impact the applicant directly, and no evidence showed the alleged sterilization was ordered against the wishes of the applicant or his wife. 1997 BIA LEXIS 25, at *8-9. Respondents on this appeal in the same way emphasize that petitioner's registration card for the family planning policy, which indicates his wife underwent an oviduct ligation, was never authenticated in accordance with applicable regulations. They further aver that while this card and the radioactive dye tests show a sterilization procedure was performed, the papers fail to show such procedure was coerced. But these arguments were not only never raised before the Board -- due to the failure of the INS to submit opposition papers to petitioner's motion, see 8 C.F.R. § 3.2(g)(3); Motions & Appeals, 61 Fed. Reg. at 18,905 -- but also must be viewed as carrying little or no weight in light of the Board's holding in In re C-Y-Z-. There, of course, the Board rejected similar contentions and held instead that the applicant had established "eligibility for asylum by virtue of his wife's forced sterilization." Id. at *9.
 
 
 52
 Taking into account the many parallels with In re C-Y-Z-, if the Board in the instant case were to have accepted as fact that petitioner's wife was sterilized, then it abused its discretion by not reaching the same conclusion here as it did in In re C-Y-Z, or at least explaining why its decision was a permissible outcome despite In re C-Y-Z-. As we have previously held, application of agency standards in a plainly inconsistent manner across similar situations evinces such a lack of rationality as to be arbitrary and capricious. Vargas v. INS, 938 F.2d 358, 362 (2d Cir. 1991).
 
 B. Accepting the Board's Interpretation
 
 53
 On the other hand, the Board correctly notes that the transcript of the immigration judge's decision contains no explicit finding that Zhao's wife was sterilized. Although -- as indicated in the foregoing discussion -- the Board would not be precluded from recognizing such a finding, we accept for the moment the Board's argument that no finding was made. Yet, even under this interpretation, we think the Board abused its discretion. For if the Board were not acknowledging that petitioner's wife underwent a tubal ligation, then its reason for denying petitioner the opportunity for a second evidentiary hearing was inadequate.
 
 
 54
 Respondents point out that petitioner was required to show on his motion to reopen that the evidence sought to be offered was not available at his first hearing. 8 C.F.R. § 3.2(c)(1); Motions & Appeals, 61 Fed. Reg. at 18,905; see also Acevedo v. INS, 538 F.2d 918, 920 (2d Cir. 1976) (per curiam). They assert that absent an explanation as to why May 1998 was the first time the test results could have been obtained, petitioner failed to satisfy his burden of showing the test results' unavailability.
 
 
 55
 But respondents fail to account for the fact that the Board sua sponte converted Zhao's motion to reconsider to a motion to reopen. Although we have no quarrels with that conversion, we point out that the Board never afforded petitioner an opportunity to provide an explanation as to why the dye tests were not previously obtainable. Such an explanation is unnecessary with a motion to reconsider. See 8 C.F.R. § 3.2(b)(1); Motions & Appeals, 61 Fed. Reg. at 18,904. In failing to provide this opportunity, the Board then abused its discretion by summarily stating that the tests "could have been conducted earlier and presented at the former hearing."
 
 
 56
 First, the relevance of the dye tests would not have been known or obvious at the time of petitioner's exclusion hearing. Both IIRIRA and In re C-Y-Z- became law years later. Thus, to fault petitioner for submitting the results after the denial of his appeal on the grounds that he could have submitted them earlier is to expect petitioner to possess to an unreasonable degree omniscient foresight of future law. Cf. In re X-G-W-, 1998 BIA LEXIS 18, at *8-9 (reopening case and applying changes in the asylum law affected after IIRIRA).
 
 
 57
 Second, the Board reasoned simply that since the alleged fact of sterilization was asserted in 1994, the test results could also have been presented in 1994. This reasoning would be more persuasive if the tests were conducted closer in time to the immigration judge's adverse ruling. Yet the tests were performed more than four years after the hearing.
 
 
 58
 Moreover, although the Board gives no explanation as to why it believed the tests were available earlier, it makes little sense to think petitioner waited to order the tests for some improper purpose, such as hoping to prolong his immigration proceedings and thereby his time in the United States. The regulations clearly provide that "the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case," but rather, a stay of deportation must be specifically granted. 8 C.F.R. § 3.2(f); Motions & Appeals, 61 Fed. Reg. at 18,905. Moreover, since "[t]he Board has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief," 8 C.F.R. § 3.2(a); Motions & Appeals, 61 Fed. Reg. at 18,904, the immigration system is structured to discourage aliens from waiting to put forth relevant evidence in the hopes of delaying or avoiding deportation. Recognizing that the regulations permit motions to reopen and motions to reconsider to be filed while an appeal to the Board is pending (i.e., before an order of exclusion or deportation becomes final), which are then converted to a motion to remand, see 8 C.F.R. § 3.2(b)(1) & (c)(4); Motions & Appeals, 61 Fed. Reg. at 18,904, 18,905, it would have been to petitioner's advantage to submit the test results earlier in time had they been available.
 
 
 59
 In light of these observations, the record as it exists demonstrates the degree to which the Board improperly engaged in speculation when it concluded that the tests on Zhao's wife could have been conducted at the time of the original hearing. See Anderson, 953 F.2d at 806. Although the burden rests first with petitioner to prove the evidence was not available and could not have been presented earlier, see 8 C.F.R. § 3.2(c)(1); Motions & Appeals, 61 Fed. Reg. at 18,905, we think under the specific circumstances of this case that the burden was met. Petitioner provided the dates of the tests with no chance to supplement his papers after his motion was converted to one to reopen. The INS never responded to the motion, thereby giving petitioner no notice that his evidence would be rejected as untimely. Nor have respondents offered on appeal any basis to believe the tests could have been done in 1994. Finally, the sequence of events lends support to petitioner.
 
 
 60
 Consequently if, upon remand, the Board explains that it never intended to recognize a finding of fact by the immigration judge, then petitioner must be granted a new hearing for the purpose of determining whether his wife was forcibly sterilized. Once that evidence is received, petitioner's case must be re-examined in light of In re C-Y-Z-, with a proper explanation as to how such precedent affects petitioner's case.
 
 C. Cursory Nature of the Board's Decision
 
 61
 The foregoing analysis amply demonstrates that by addressing the issue of petitioner's new evidence in only two sentences, the Board created controversy and confusion. Failure to explain a decision adequately provides a ground for reversal. See Anderson, 953 F.2d at 806 (cursory, summary or conclusory statements from the Board leave us to presume nothing other than an abuse of discretion). We think it best for the Board to clarify upon remand what it meant when it employed the phrase "the Immigration Judge so found." Its explanation on appeal is at such odds with the plain language of its decision, that we hesitate to resolve the matter in the first instance.
 
 
 62
 Moreover, when faced with a motion to reopen, the Board has an obligation to consider the record as a whole. See id.; see also Blanco v. INS, 68 F.3d 642, 647 (2d Cir. 1995) (finding an abuse of discretion where the Board decided a motion to reopen without considering the record before it). Yet, in the case at hand, the Board failed to address all the factors relevant to petitioner's claim; otherwise, it would have discussed the discrepancy between the immigration judge's adverse credibility finding and its statement that the judge found a fact to which petitioner testified and which supported petitioner's claim. Analyzing this discrepancy, in addition, would have pressed the Board to explain the precedential value of In re C-Y-Z- as it pertains to this case.
 
 CONCLUSION
 
 63
 In accordance with the foregoing analysis, the decision of the Immigration Board of Appeals to deny petitioner's motion to reopen is reversed, and the case remanded for further proceedings consistent with this opinion.
 
 
 
 NOTES:
 
 
 [1]
 Lending credibility to what the subcommittee found, the New York Times in a front page story noted that the PRC is now engaged in one of its periodic "Strike Hard" campaigns against citizens accused of committing a changing list of crimes. The crack-down, according to the news report, is random and brutal, often leading to summary execution of ordinary citizens for offenses that formerly were not considered of a serious nature. Craig S. Smith, China Justice: Swift Passage to Execution, N.Y. Times, June 19, 2001, at A1.